# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

**BRENDA KAYSER,**                                              Case No. 3:16-cv-00153-YY

          Plaintiff,                                   **OPINION AND ORDER**

    v.

**COMMISSIONER OF SOCIAL
SECURITY,**

          Defendant.

**YOU, Magistrate Judge:**

Plaintiff, Brenda Kayser ("Kayser"), seeks judicial review of the final decision by the

Commissioner of Social Security ("Commissioner") denying her application for Supplemental

Security Income ("SSI") under Title XVI of the Social Security Act.  This court has jurisdiction

under 42 U.S.C. § 405(g) and § 1383(c).  All parties have consented to allow a Magistrate Judge

to enter final orders and judgment in this case in accordance with FRCP 73 and 28 U.S.C.

§ 636(c).  ECF #4.  Because the Commissioner's decision is supported by substantial evidence

and based on proper legal standards, it is AFFIRMED.

///

///

///

Kayser filed her application for SSI on March 27, 2012 alleging disability beginning September 1, 2010. Tr. 155–56.[1] After the Commissioner denied her application initially and upon reconsideration Kayser requested a hearing before an Administrative Law Judge ("ALJ"), which was held on June 26, 2014. Tr. 36–62, 64, 108–10. On July 10, 2014, the ALJ issued a decision finding Kayser not disabled. Tr. 15–31. The Appeals Council denied Kayser's subsequent request for review of that decision on December 7, 2015. Tr. 1–6. Therefore, the ALJ's decision is the Commissioner's final decision subject to review by this court. 20 C.F.R. §§ 404.981, 416.1481, 422.210.

## **BACKGROUND**

Born in 1964, Kayser was 46 years old on her alleged onset date of disability and 50 years old on the date of the administrative hearing. Tr. 24, 65, 155–56. She has two children and worked as they grew up. Tr. 42. She speaks English and earned a GED. Tr. 24. She was involved in at least one motor vehicle accident in her twenties. Tr. 26, 439. She began smoking cigarettes at eight years old, and currently smokes half a pack a day despite experiencing asthma and chronic obstructive pulmonary disease ("COPD") symptoms, and despite being repeatedly and strongly urged to quit by health care providers. Tr. 53, 54, 256, 288, 293, 303, 320, 446, 447, 512, 548. She also has a long history of smoking marijuana. Tr. 267, 281, 283, 295, 346, 512, 534. She has past relevant work experience as a cashier, order filler, and temporary warehouse worker; however, she has not worked since 2001. Tr. 20, 76. Kayser alleges she is unable to work due to combined impairments of depression, anxiety, pain in her neck and back,

---

[1] Citations are to the page(s) indicated in the official transcript of the record filed on July 26, 2016 (ECF #15).

degenerative disc disease, attention deficit disorder, asthma, emphysema, arthritis in her left hip, and fibromyalgia.  Tr. 66, 184; Pl.'s Opening Br., ECF #16, at 2.

## MEDICAL HISTORY

In April 2010, Kayser's primary care physician, Mindi Robinson, M.D., conducted an imaging study of Kayser's lumbar spine after she complained of pain in her left hip and back. Tr. 301.  The results were stable from the prior year's exam and were within normal limits with no acute findings.  Tr. 302.  Kayser also complained of pain in her tailbone.  Tr. 303.  Although she had fallen when moving out of her apartment, she experienced no increase in pain as a result of this incident.  Tr. 277, 299, 305.

Later that same month, Kayser experienced an exacerbation of asthma and COPD symptoms after she was exposed to fumes that likely contained chlorine gas, which could have been produced from her landlord's attempt to clean up cat urine with bleach.  Tr. 290–92.  She was given DuoNeb by emergency medical services in route to the emergency department, and was wheezing and short of breath upon admission.  Tr. 290, 291.  She was prescribed albuterol MDI and a five-day course of prednisone, strongly urged to quit smoking, and discharged the same day.  Tr. 291.  Ten days later, she presented to the emergency department again complaining of wheezing and shortness of breath.  Tr. 287, 288.  She denied alcohol or drug use but continued smoking cigarettes.  Tr. 288.

Dr. Robinson saw Kayser several times in May 2010.  Kayser complained of cough, dyspnea, wheezing, back pain, headaches, and additional pain.  Tr. 297.  She also told Dr. Robinson that riding her bike made her leg feel sore.  Tr. 281.  Dr. Robinson observed that Kayser appeared anxious but was not in acute distress.  Tr. 297.

Kayser visited Dr. Robinson again in June 2010.  Kayser admitted using marijuana to help deal with her anxiety.  Tr. 279.  She complained of severe hip pain, but Dr. Robinson refused to refill a morphine prescription until Kayser tested negative for recreational drugs.  Tr. 279.  Kayser denied experiencing fatigue or confusion, feeling hopeless or helpless, but appeared anxious.  Tr. 277, 279.  An X-ray showed mild degenerative joint disease.  Tr. 279.  Dr. Robinson remarked Kayser "has chronic pain issues with probable fibromyalgia."  Tr. 277.  The following month, Dr. Robinson reported that Kayser had improved control over her anxiety with Buspar.  Tr. 258.

Kayser presented to the emergency department in November 2010.  Tr. 351.  A chest X-ray showed obstructive pulmonary parenchymal physiology and mild centrilobular emphysema; however, Kayser improved dramatically with the administration of albuterol nebulizer therapy.  Tr. 356.

Kayser was hospitalized in March, April, and May 2011 for exacerbation of her COPD symptoms.  Tr. 319, 331, 333, 350–59.  Leading up to each hospitalization, she had failed to fill her prescriptions or schedule follow-up appointments and continued smoking cigarettes.  Tr. 319.  She also tested positive for cannabinoids, despite telling Dr. Robinson in 2010 that she would refrain from further marijuana use.  Tr. 261, 323.  Upon discharge, she was advised to follow up with several free care clinics and multiple local area indigent clinics.  Tr. 319.  In September 2011, she again presented to the emergency department after experiencing shortness of breath, but left the same day against medical advice.  Tr. 308.  After this, there is no evidence that Kayser sought treatment until early 2013.

However, in September 2012, John Ellison, M.D., examined Kayser at the request of the Commissioner.  Tr. 441.  Dr. Ellison diagnosed "chronic depression and anxiety, partially

controlled," generalized pain with very little tenderness to suggest fibromyalgia, "chronic

lumbosacral and left hip pain reportedly due to degenerative changes but she is very limber,"

chronic smoker's bronchitis, reactive airway disease, gastroesophageal reflux disease, peripheral

neuropathy in her feet, remote history of hepatitis B with jaundice, and a remote history of drug

and alcohol abuse. Tr. 441.

State medical consultants also reviewed Kayser's medical history in October 2012 and

February 2013. Tr. 65–78, 80–97. The ALJ accurately summarized their findings:

> The consultants concluded that the claimant had the capacity to lift and/or carry
> 20 pounds occasionally and less than 10 pounds frequently; that she could stand
> or walk with normal breaks for at least six hours in an eight-hour workday; and
> that she could sit with normal breaks for a total of about six hours in an eight-hour
> workday. The consultants also found that the claimant's ability to do work related
> activities that involved pushing or pulling, including the operation of hand or foot
> controls, was unlimited, other than for the lift and/or carry limitation mentioned
> above. The consultants further found that the claimant could frequently climb
> ladders, ropes, and scaffolds, frequently climb ramps and stairs, frequently kneel,
> frequently crouch, and frequently crawl. They added that the claimant's ability to
> balance and stoop was unlimited. The consultants also established that the
> claimant needed to avoid concentrated exposure to fames, odors, dusts, gases, and
> poor ventilation.

Tr. 27 (citing tr. 65–78, 80–97).

In March 2013, Kayser underwent a week-long vocational evaluation to determine

whether she could engage in competitive employment. Tr. 241. The vocational evaluator found

that Kayser had below average math skills, average reading comprehension skills, and below

average grammar skills. Tr. 241–42. Kayser performed above average on motor-coordination

tests, although she did not finish several tests due to complaints of pain. Tr. 242–45. The

evaluator determined that Kayser can read and understand simple information, she can listen and

understand oral instructions, she can communicate information in writing, and that she can

effectively communicate oral information to others. Tr. 249. The evaluator also found that

Kayser followed and completed tasks as assigned, she did not have difficulty learning new tasks,

she was able to organize, problem-solve, and complete the logical reasoning tests quickly and accurately, she remembered multi-step directions and correct task sequence without any significant memory deficit, and that she was timely. Tr. 250. However, the evaluator ultimately concluded that Kayser was not competitively employable because her "multiple medical conditions negatively impacted her stamina in performing tasks for any length of time due to pain." Tr. 250.

Kayser visited the emergency department again in July 2013. The doctor's report listed Kayser's arthritis of the hip and fibromyalgia as resolved. Tr. 491. Additional emergency-department records from December 2013 list Kayser's arthritis of the hip, asthma, emphysema, and fibromyalgia as resolved. Tr. 486. The doctor did not prescribe pain medication despite Kayser's complaints of pain. Tr. 492. February 2014 emergency-department records also continued to list Kayser's arthritis of the hip and fibromyalgia as resolved. Tr. 459.

In March 2014, Kayser saw Dr. Denise Palke at the Rosewood Family Health Center. Tr. 541–59. Kayser reported "diffuse pain complaints, including non-specific muscle pains, neck and upper back pain, tailbone pain, low back pain." Tr. 548. Dr. Palke diagnosed fibromyalgia and recommended that Kayser exercise and receive counseling, but Kayser expressed only moderate interest in these activities. Tr. 548. Dr. Palke was surprised to learn Kayser continued smoking cigarettes while taking Chantix, and urged her to quit smoking to help relieve her asthma symptoms and chronic pain. Tr. 548.

In May 2014, Kayser saw Dr. Oleg Maskimov at the Columbia Pain and Spine Institute. Tr. 560–63. While Kayser was referred to the clinic due to complaints of back and neck pain, Dr. Maskimov recommended only physical therapy, the use of nonsteroidal anti-inflammatory medications, and "not to use any type of opioid medications." Tr. 563. He recommended

Kayser undergo further diagnostics, including an MRI, but found the range of motion of her spine, pelvis, and ribs had normal flexion, normal lateral bending, and no evidence of laxity, but painful hyperextension, and that the range of motion of her head and neck had normal left and right sided rotation, lateral bending, flexion, and extension, but palpatory tenderness of cervical spine C5-6 segments. Tr. 562. All dural root tension signs, Braggardis' Tests, discogenic provocation maneuvers, and sacroiliac joint provocation maneuvers were negative. Tr. 562. Dr. Maskimov further reported that Kayser had "no depression, anxiety, or agitation." Tr. 563.

During a follow up in June 2014, Dr. Palke reported that gabapentin seemed to resolve Kayser's fibromyalgia symptoms, but noted that Kayser sometimes forgets to take it. Tr. 553–56.

## **STANDARD OF REVIEW**

The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). This court must weigh the evidence that supports and detracts from the ALJ's conclusion. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citing *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998)). The reviewing court may not substitute its judgment for that of the Commissioner. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007)); *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). Where the evidence is susceptible to more than one rational interpretation, the Commissioner's decision must be upheld if it is "'supported by inferences reasonably drawn from the record.'" *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (quoting *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004)); *Lingenfelter*, 504 F.3d at 1035.

The initial burden of proof rests upon the claimant to establish disability. *Howard v. Heckler*, 782 F.2d 1484, 1486 (9th Cir. 1986). To meet this burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 USC § 423(d)(1)(A). The Commissioner has established a five-step sequential process for determining whether a person is disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 CFR §§ 404.1502, 404.920.

At step one, the Commissioner considers whether a claimant is engaged in "substantial gainful activity." *Yuckert*, 482 U.S. at 140; 20 CFR §§ 404.1520(b), 416.920(b). If so, the claimant is not disabled.

At step two, the Commissioner evaluates whether the claimant has a "medically severe impairment or combination of impairments." *Yuckert*, 482 U.S. at 140–41; 20 CFR §§ 404.1520(c), 416.920(c). If the claimant does not have a severe impairment, she is not disabled.

At step three, the Commissioner determines whether the claimant's impairments, either singly or in combination, meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 U.S. at 140–41; 20 CFR §§ 404.1520(d), 416.920(d). If so, the claimant is presumptively disabled; if not, the Commissioner proceeds to step four. *Yuckert*, 482 U.S. at 141.

At step four, the Commissioner resolves whether the claimant can still perform "past relevant work." 20 CFR §§ 404.1520(f), 404.920(f). If the claimant can work, she is not disabled; if she cannot perform past relevant work, the burden of proof shifts to the Commissioner.

At step five, the Commissioner must demonstrate that the claimant can perform other work existing in significant numbers in the national or local economy. *Yuckert*, 482 U.S. at 141–42; 20 CFR §§ 404.1520(g), 416.920(g). If the Commissioner meets this burden, the claimant is not disabled. 20 CFR §§ 404.1566, 416.966.

## ALJ'S FINDINGS

At step one, the ALJ found that Kayser had not engaged in substantial gainful activity since March 27, 2012, the date she applied for SSI benefits. Tr. 20.

At step two, the ALJ found that Kayser has impairments or combinations of impairments that are severe impairments: arthritis of the hip, COPD, anxiety, and depression. Tr. 20.

At step three, the ALJ found Kayser did not have an impairment or combination of impairments that met or medically equaled a listed impairment. Tr. 21. The ALJ also found that Kayser suffered from several non-severe medically determinable impairments including fibromyalgia, degenerative disc disease, and gastrointestinal reflux disease. Tr. 21.

The ALJ next assessed Kayser's RFC and determined that she could perform light work with the following limitations: she can frequently climb, stoop, crouch, kneel, and crawl; she must avoid concentrated exposure to noxious fumes and odors; she is limited to simple, entry level work that requires no math calculations; and she can have only occasional interaction with the public and coworkers. Tr. 24.

At step four, the ALJ found Kayser could not perform any of her past relevant work. Tr. 30.

At step five, the ALJ determined Kayser could perform jobs that exist in significant numbers in the national economy, including small product assembler and price marker. Tr. 30–31. The ALJ therefore concluded Kayser is not disabled. Tr. 31.

<u>**DISCUSSION**</u>

Kayser argues the ALJ erred by failing to include all of her severe impairments at step two, by rejecting her subjective symptom testimony, and by improperly evaluating the vocational rehabilitation evidence. Pl.'s Opening Br., ECF #16, Pl.'s Reply Br., ECF #18.

**A.     Step Two Findings**

Kayser contends the ALJ erred at step two by improperly finding that her fibromyalgia was not formally diagnosed and by failing to label it a "severe" impairment. Pl.'s Opening Br., ECF #16, at 4. She argues that under Social Security Ruling ("SSR") 12-2p, either the 1990 or the 2010 ACR Preliminary Diagnostic Criteria ("2010 Criteria") are sufficient to establish a diagnosis of fibromyalgia, and the ALJ incorrectly found that Kayser did not meet the 2010 Criteria. *Id.* at 4–7 (stipulating that the 1990 criteria were not met).

At step two, the ALJ determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. §§ 404.1520(a), 416.920(a). An impairment is "not severe" if it "does not significantly limit [the claimant's] ability to do basic work activities." *Id.* However, "[o]missions at step two are harmless if the ALJ's subsequent evaluation considered the effect of the impairment omitted at step two." *Harrison v. Astrue*, 2011 WL 2619504, at *7 (D. Or. July 1, 2011) (citing *Lewis*, 498 F.3d at 911). The ALJ is responsible for resolving conflicts in the medical record, and may draw inferences about the severity of an impairment based on the degree of treatment the claimant sought. *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008); *Flaten v. Sec'y of Health*, 44 F.3d 1453, 1464 (9th Cir. 1995).

To establish a diagnosis of fibromyalgia under the 2010 Criteria, there must be a "history of widespread pain" in all quadrants of the body that has persisted for at least three months;

"repeated manifestations of six or more symptoms, signs, or co-occurring conditions; and evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded."  SSR 12-2P (S.S.A.), 2012 WL 3104869.

Here, the ALJ found there was no "objective evidence, beyond [Kayser's] testimony, that she suffers from six or more fibromyalgia symptoms, signs, or co-occurring conditions. Furthermore, in December 2013, her treating provider indicated [Kayser's] history of fibromyalgia had 'resolved.'"  Tr. 21 (citing tr. 486).  Kayser argues that the ALJ ignored evidence that she suffered from six fibromyalgia conditions, specifically memory loss, fatigue, anxiety, depression, blurry vision, and shortness of breath.  Tr. 486; ECF #16, at 6.  However, as discussed below, the ALJ's finding that Kayser did not have fibromyalgia was supported by substantial evidence.

Dr. Palke diagnosed Kayser with fibromyalgia in 2014, but also reported that Kayser's symptoms appeared to be under control with gabapentin, although Kayser sometimes forgot to take it.  Tr. 553–56.  Dr. Robinson, Kayser's primary care physician, found Kayser's fibromyalgia had resolved in December 2013, causing no more than minimal limitations.  Tr. 21, 542, 553, 554, 558.  Emergency-department records in 2013 and 2014 also listed Kayser's fibromyalgia as resolved.  Tr. 459, 486, 491.  To the extent a conflict exists regarding Kayser's fibromyalgia diagnosis, where there was more than one report that Kayser's fibromyalgia had resolved, it was reasonable for the ALJ to resolve this conflict and find that Kayser's fibromyalgia was not a severe impairment.

Furthermore, the ALJ reasonably concluded that Kayser exaggerated her symptoms, as discussed further in subsection B, *infra*.  The ALJ also correctly found that Kayser did not meet six of the listed symptoms, signs, or co-occurring conditions.  For example, in her disability

appeal, Kayser reported "My memory loss i [sic] really bad. I do not remember things, places, or dates." Tr. 210. When assessing Kayser's mental residual functional capacity in October 2012, Dr. Linda Jensen reported that Kayser had understanding and memory limitations. Tr. 75. In September 2012, Dr. Ellison reported Kayser's memory tracking was "a little spotty." Tr. 440 (finding Kayser's ability to understand and remember very short and simple instructions was not significantly limited, but that her ability to understand and remember detailed instructions was moderately limited). However, the vocational expert found Kayser "remembered multi-step directions and correct task sequence" and did not note any significant memory deficit, and Kayser denied memory loss to Dr. Maskimov in 2014. Tr. 250, 561. Therefore, while reasonable minds could disagree about whether Kayser suffered repeated manifestations of memory problems, the ALJ's decision was based on substantial evidence.

Similar problems exist with Kayser's reported symptoms of fatigue, blurred vision, and depression. Addressing these symptoms in detail is unnecessary, however, because the 2010 Criteria require the presence of six symptoms, and without a showing that she suffered from memory loss, Kayser has already failed to meet this requirement. Additionally, although the ALJ did not discuss the third 2010 Criteria, i.e., whether underling conditions that could explain those symptoms were excluded, Kayser failed to provide any exclusionary diagnoses.

In any event, the ALJ resolved step two in Kayser's favor. Tr. 20. Any omission is harmless if the ALJ considered the effect of Kayser's alleged impairments in subsequent steps of the disability evaluation. *Lewis*, 498 F.3d at 911; *Burch v. Barnhart*, 400 F.3d 676, 682 (9th Cir. 2005). Because the ALJ decided step two in Kayser's favor, and considered and discussed her alleged fibromyalgia symptoms in her residual functional capacity, any error is harmless. Tr. 24–30.

**B.     Kayser's Testimony**

There is a two-step process for evaluating a claimant's testimony about the severity and limiting effect of the claimant's symptoms. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Lingenfelter*, 504 F.3d at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)). When doing so, "the claimant need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996).

"Second, if the claimant meets this first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1281). It is "not sufficient for the ALJ to make only general findings; he must state which pain testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). Those reasons must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (citing *Bunnell*, 947 F.2d at 345–46).

Examples of specific, clear and convincing reasons include medical noncompliance, conflicting medical evidence, effective medical treatment, inconsistencies either in the claimant's testimony or between her testimony and her conduct, activities of daily living that are inconsistent with the alleged symptoms, a sparse or sporadic work history, testimony that is

vague or less than candid, and testimony from physicians and third parties about the nature, severity, and effect of the complained symptoms. *Tommasetti*, 533 F.3d at 1040; *Lingenfelter*, 504 F.3d at 1040; *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ's credibility decision may be upheld overall even if not all of the ALJ's reasons for rejecting the claimant's testimony are upheld. *See Batson*, 359 F.3d at 1197. The ALJ may not, however, make a negative credibility finding "solely because" the claimant's symptom testimony "is not substantiated affirmatively by objective medical evidence." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

Effective March 16, 2016, the Commissioner superseded Social Security Rule ("SSR") 96-7p governing the assessment of a claimant's "credibility" and replaced it with a new rule, SSR 16-3p. *See* SSR 16-3p, 2016 WL 1119029. SSR 16-3p eliminates the reference to "credibility," clarifies that "subjective symptom evaluation is not an examination of an individual's character," and requires the ALJ to consider of all of the evidence in an individual's record when evaluating the intensity and persistence of symptoms. *Id.* at *1–2. Here, because the ALJ's credibility determination passes muster under both SSR 96-7p and SSR 16-3p, it is unnecessary to reach the question of whether SSR 16-3p applies retroactively.

In her application and at the hearing, Kayser alleged that she was unable to work primarily due to pain. Tr. 55, 200. She stated that she was limited in all postural activities including standing, walking, sitting, reaching, and stair climbing, as well as memory, concentration, completing tasks, following instructions, understanding, and using her hands. Tr. 205. She alleged that she cannot handle stress and is easily confused by changes in routine. Tr. 206. She also stated that ADD, depression, anxiety, memory problems, and disc disease interfered with her ability to perform any activities, including substantial gainful activity. Tr.

207.  However, the ALJ rejected Kayser's testimony regarding the nature and severity of her limitations.  Tr. 28.

### 1.  Activities of Daily Living

First, the ALJ found that Kayser's activities of daily living undermined her allegations of disabling pain.  Tr. 28–29.  This finding is based on specific, clear and convincing reasons.

An ALJ may rely on a claimant's activities in evaluating the claimant's testimony. *Molina v. Astrue*, 674 F.3d 1104, 1112–13 (9th Cir. 2012).  "[T]he mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001).  A claimant does not need to be "utterly incapacitated." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

Here, the ALJ noted that Kayser performed self-care independently, went shopping, drove a car,[2] went fishing, and used public transportation.  Tr. 28–29, 204, 439.  The ALJ also noted that Kayser traveled to Michigan to care for her mother who was recovering from knee-replacement surgery.  Tr. 43–44.  The Ninth Circuit has held that the ALJ may infer from a claimant's ability to travel to care for an ailing relative that the claimant is not as limited as alleged. *Tommasetti*, 533 F.3d at 1038.  Kayser correctly asserts that the ALJ did not specifically discuss the nature of her trips or otherwise explain how the trips to Michigan impeached her testimony.[3]  However, overall, the ALJ's opinion was "sufficiently specific to permit the court

---

[2]  Kayser asserts in her opening brief that she does not own a car, implying that she does not drive.  ECF #16, at 11.  However, in her 2012 SSI application, she listed that she owned a 1988 Chevy Van and at the administrative hearing, stated that she and her boyfriend "live in our van."  Tr. 42, 156.

[3]  Kayser testified that she went on two trips to Michigan for a total of seven months.  Tr. 43–44.

to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

### 2. Work History

Second, the ALJ found that Kayser's work history undermined her complaints of disabling pain. Tr. 20, 29. This finding is also based on specific, clear and convincing reasons.

An ALJ may consider the claimant's work history when considering her symptom testimony. *Smolen*, 80 F.3d at 1284; *Bruton v. Massanari*, 268 F.3d 828 (9th Cir. 2001). Here, the ALJ concluded that "a review of [Kayser's] work history shows that [she] worked only sporadically prior to the alleged disability onset date, which raises a question as to whether [her] continuing unemployment is actually due to medical impairments." Tr. 29. Indeed, Kayser has not held a job since 2001. Tr. 20, 76.

Kayser argues that her case is not one in which her work history "undercuts her assertions," like *Copeland v. Bowen*, 861 F.2d 536, 542 (9th Cir. 1988), in which the claimant lacked credibility because while seeking disability benefits, he held himself out as available to work to receive unemployment benefits. ECF #16, at 12. However, that is not the only way a claimant's work history can undermine her credibility. For example, in *Thomas v. Barnhart,* 278 F.3d 947, 959 (9th Cir. 2002), "the ALJ found that [the claimant] had an 'extremely poor work history' and 'has shown little propensity to work in her lifetime,' which negatively affected her credibility regarding her inability to work." Here, like in *Thomas*, the ALJ reasonably considered Kayser's lengthy history of unemployment in concluding that her symptoms were not the cause of her unemployment.

///

///

### 3. Medical Care Inconsistent with Impairments and Severity

Third, the ALJ found that Kayser's statements conflicted with the objective medical record. Tr. 28. An ALJ may not make a negative credibility finding solely because the objective medical evidence does not support the severity of the claimant's impairments. *Burch*, 400 F.3d at 680. "The rationale for this restriction is that pain testimony may establish greater limitations than can medical evidence alone." *Id.* "Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis." *Id.*

Kayser alleged that she was unable to work primarily due to pain, but the record does not contain any opinions from treating or examining physicians indicating that Kayser was disabled or that she could not work. The record is also void of any limitations greater than those incorporated into the RFC. *See* tr. 24, 28. For example, an April 2010 x-ray of Kayser's lumbar spine was normal despite her complaints of tailbone pain radiating into the left leg. Tr. 301. Her primary care physician, Dr. Robinson, found no cause for this significant increase in chronic pain. Tr. 302. Moreover, despite continuing to report severe pain at the administrative hearing, and despite having been referred to a pain clinic, Kayser has yet to receive treatment from a pain clinic. Tr. 50.

The ALJ found Kayser "has visited emergency departments repeatedly, but she has not received the type of medical treatment one would expect. . . ." Tr. 29. Indeed, most of the medical record deals with the exacerbation of her COPD and asthma symptoms—not treatment for chronic pain. Additionally, these symptoms have been consistently resolved with medical treatment. For example, the ALJ found "[s]he has COPD, but she has maintained good oxygen saturation, despite continuing to smoke tobacco." Tr. 30. The severity of these symptoms is also

in question.  In fact, Kayser continued to smoke marijuana even though her primary care doctor made her prescription for pain-relief medication contingent on cessation.  Tr. 279, 297.  This also suggests that her pain is not as severe as she reports.

Furthermore, the record is full of instances where Kayser and her medical providers report that she is depressed or anxious and then that she is not.  Tr.  24, 26, 279, 441, 548, 563.  When Dr. Palke recommended she see a counselor to help with complaints of depression, Kayser did not express interest and did not seek psychiatric treatment.  Tr. 26, 548.  Regardless, the ALJ accounted for these impairments in the RFC.  Tr. 30.

Together, these conflicts with the objective medical evidence support the ALJ's finding that Kayser's symptom testimony was less than credible.

### 4. Noncompliant Medical History

Fourth, the ALJ noted that Kayser's treatment history was sparse and her complaints sporadic.  Tr. 29.  The amount of treatment sought for an impairment is "an important indicator of the intensity and persistence of [a claimant's] symptoms."  20 C.F.R. § 416.929(c)(3).  Further, gaps in treatment and evidence of conservative treatment can be sufficient to discount a claimant's testimony regarding the severity of an impairment.  *Burch*, 400 F.3d at 681; *Parra*, 481 F.3d at 750–51.

The ALJ found that Kayser was not complaint with the course of treatment.  Tr. 29, 511–12.  An ALJ may not "rely on the claimant's failure to take pain medication where evidence suggests that the claimant had a good reason for not taking medication."  *Fair*, 885 F.2d at 602.  Here, there was no good reason for Kayser's noncompliance.

Kayser would have the court construe the March 2013 treatment note to signify that, because the note reports she has only a history of poor medication compliance, she is not

presently noncompliant. Tr. 29, 511, 512. However, this inference is not required, much less necessary. She could both have a history of noncompliance and be noncompliant at the same time.

Nevertheless, the ALJ's finding is supported by substantial evidence. Kayser continued to smoke cigarettes and marijuana despite the exacerbation of her asthma and COPD, despite numerous medical practitioners strongly urging her to quit, and despite having free resources made available to her to help her do so. Tr. 53, 54, 256, 267, 281–88, 293–95, 303, 320, 346, 446, 447, 512, 534, 548. Kayser failed to comply with her medical provider's recommendations and repeatedly visited emergency departments for shortness of breath. Tr. 25, 26, 287–91, 297. She did not seek treatment from September 2011 until early 2013. Tr. 25. She also did not see a doctor or fill prescriptions for a period in 2011, and she did not seek treatment at multiple local area indigent and free care she was referred to. Tr. 25, 319. Further, although she complained of depression and anxiety, she did not express interest in or seek psychiatric treatment. Tr. 548. At times, she also did not take her medications regularly. Tr. 25, 553–56.

In sum, the ALJ's rejection of Kayser's subjective symptom testimony was based on specific, clear and convincing reasons: her activities of daily living undermined her allegations of disabling pain, her work history suggests her impairments and symptoms are not the reasons she is unemployed, her statements and subjective complaints do not comport with the objective medical evidence, and she has a history of noncompliance in following her course of treatment and her doctor's recommendations. These reasons are supported by substantial evidence in the record. Therefore, the ALJ did not error at this step.

///

///

## C.    Vocational Rehabilitation Evidence

Kayser next argues that the ALJ erroneously rejected the vocational rehabilitation evaluation. Tr. 241–50.  Vocational testing revealed Kayser suffered physical discomfort from using both hands and limitations due to pain in the upper back, shoulders, and arms.  Tr. 242–44.  The test coordinator opined that Kayser would be unable to meet the physical endurance requirements to sustain an adequate level of work performance for an extended period and concluded that Kayser was "not competitively employable."  Tr. 249–50.  The ALJ considered the vocational rehabilitation evaluation and gave some weight to the statement that Kayser can perform simple, routine tasks, but rejected the conclusion that Kayser cannot perform competitive employment, noting that such opinions are reserved for the Commissioner.  Tr. 27–28.

The vocational testing coordinator is an "other source" under the Regulations.  SSR 06-3p.  The ALJ is required to provide "germane" reasons for rejecting an "other source" opinion.  *Valentine v. Comm'r*, 574 F.3d 685, 694 (9th Cir. 2009).  While the ALJ is not required to accept the testing coordinator's conclusion on the issue of disability, he was required to provide germane reasons for rejecting the limitations set forth in the vocational evaluation.  *Id.*; SSR 96-5p.

Here, in his evaluation of the evidence, the ALJ noted that the vocational evaluator based his conclusions on Kayser's self-reports regarding pain, which the ALJ discredited.  The ALJ is entitled to discount an opinion when it is based on a claimant's subjective descriptions of pain, when that claimant's testimony has been properly rejected.  *Batson*, 359 F.3d at 1195.  As discussed above, the ALJ provided legally sufficient reasons discounting Kayser's symptom

testimony.  Therefore, the ALJ provided a germane reason for rejecting the vocational rehabilitation evidence.

Furthermore, and notably, no medical professional—including Kayser's primary care physician—opined that she cannot work, regardless of the restrictions the ALJ provided for in her residual functional capacity.  The only medical opinion evidence regarding the ultimate issue of disability on record is from state agency medical and psychological consultants, whose opinions the ALJ heavily relied on in forming the RFC.  While Kayser would prefer a more favorable interpretation of the evidence in the record, the court may not substitute its judgment for that of the Commissioner.  *Parra*, 481 F.3d at 746.

## CONCLUSION

For the reasons discussed above, the Commissioner's decision that Kayser is not disabled is supported by substantial evidence and based on proper legal standards and is therefore AFFIRMED.

IT IS SO ORDERED.

DATED this 18th day of May, 2017.

/s/ Youlee Yim You
_____
Youlee Yim You
United States Magistrate Judge